Next argument before us is 23-3145 Phannenstiel v. Kansas Thank you, Your Honor. I'm Alan Johnson, and I represent the three appellants who remain in this case, and I would like to reserve three minutes of my time for rebuttal. As the Court knows from reading the briefs, all three of the plaintiffs who remain in the case have filed asserted Title VII hostile work environment claims against the Kansas Highway Patrol. In addition, one of the plaintiffs, Jara Cooper, has filed a 1983 First Amendment claim against the former superintendent of the Highway Patrol, Herman Jones, in his personal capacity. Because of my limited time here, I want to focus just on the hostile work environment claims of Ms. Phannenstiel and Ms. Harrington because those are the more complicated claims. And my main contention is that the District Court, in considering the hostile work environment claims of Ms. Harrington and Ms. Phannenstiel, did not consider the totality of the circumstances which this Court has made clear must be considered. Now, taking Ms. Phannenstiel first, she was the, at the time of the events in this lawsuit, she was the Human Resources Director for the Kansas Highway Patrol. She testified that there were four hostile acts directed toward her by Mr. Jones and that one of those involved a sexually suggestive text message or instant message that she found to be offensive. The other three are more complicated and are described in the brief, but the District Court found that at least that first text message or instant message, which had an emoji with a tongue hanging out and referred to a couch in the office, was at least arguably sex-related. And so she found that there was at least one act towards Ms. Phannenstiel that was sex-related. What the District Court didn't consider, we contend, is that there were other acts of sexual harassment that Ms. Phannenstiel was aware of that was direct against other women in the work environment. And this Court has made clear in several cases that in looking at the totality of the circumstances, you must look at not only the acts directed toward a plaintiff, but also acts directed towards other women in the work environment. And you said there were two other instances that... The claim there's actually three, Judge. In fact, the judge, the District Court... Could you just refresh my memory on... Yes, the District Court... Give me five words on each of the three. Okay. One of them was Amber Harrington, who I'll talk about in a minute, and what her issues are. The other one... The touchings. Right. The other one was Kimberly Meter, who was a former plaintiff, and there were four incidents of being hugged by Mr. Jones. And the third was Natasha McCurdy, who was also a plaintiff originally, and she testified that she was hugged by Mr. Jones on three occasions and that that made her feel uncomfortable. Now, all of those allegations are in the record because all three of them... Two of them remain plaintiffs. The other one, Ms. McCurdy... Actually, Ms. Meter and Ms. McCurdy are no longer plaintiffs, but their testimony is in the record. And Ms. Fanninsteel testified that Ms. Harrington and Ms. Meter came to her and complained to her about Mr. Jones' inner capacities as the Human Resources Officer. Now, Ms. McCurdy testified that she did not initially complain, but that Ms. Fanninsteel, who'd heard rumors about conduct directed towards her, called Ms. McCurdy, and Ms. McCurdy then testified. I told her about all of these instances. So, the district court, we believe, did not consider those. All the district court looked at were the four incidents directed directly towards Ms. Fanninsteel and not the larger totality of the hostile work environment that Ms. Fanninsteel was... Could be both determined to be both severe and pervasive? Or is it more go-to pervasive? That goes to both. It's my contention a reasonable jury could find when all of them are wrapped up together that it was either pervasive and or severe because some of the acts interfered with their conduct. Many of the acts were physical touchings, which the court has said is important to look at. So, yes, my contention is that jury could reasonably find them to be pervasive and or severe. The cases that you rely on as the physical touching, they go way beyond a hug, don't they? Yes. I mean, essentially an assault. Yes. So, I mean, we're not looking at the kind of severity that we have faced in some of those other cases. Well, it depends on how you look at the record in terms of the hug. Well, one of the touchings, she wasn't even aware it happened until somebody told her later, right? That's true. And that's the least severe of those. There are other ones in which it was a chest hug that lasted a long time, that Colonel Jones wrapped his hands around the body and that they felt very uncomfortable. There was another one in which he didn't touch her, but testimony was he stood behind her, breathed. You could tell him breathing behind her and then made a remark about shaking it for her. Again, those are not what courts have called uncivil actions. Those are actions that have physical components to them. Certainly, our contention is that whether or not they're severe and pervasive should be decided by the jury because, as this court had said many times, house-to-work environment claims are quintessentially jury questions. So, unless the court has any questions on Ms. Fannin's field, I would like to turn to Ms. Harrington's claims. Now, Ms. Harrington is still employed by the Highway Patrol, and at the time of the incidents involved here, she was in charge of security at the Kansas Capitol Building. And she testified that there were three incidents where Mr. Jones touched her. And Judge McHugh, as you pointed out, in one of those, she also testified, conceded she did not remember one of those. Well, it was more than not remembering it. Didn't she indicate that she didn't deem it to be an inappropriate action? And somebody came up to her and said, well, didn't you see this? And she said no. Right. Okay. So it was not misremembering. Right. It was not deeming it to be a problem. Correct. So does that make it two instances rather than three? I would go back to two because subjectively she may have felt that way, but objectively she didn't. Now, the key in Ms. Harrington's, though, is that in looking at totality of the circumstances, you have to look at the retaliatory acts of Mr. Jones primarily. And is this the placement of manpower at the state?  No. What I'm actually talking about, which the district court, I contend, did not view the record most clearly, was the fact that after Ms. Harrington filed this lawsuit, then Colonel Jones took retaliatory actions against her, we contend in response to the filing of this lawsuit. But those acts, allegedly, even the evidence indicated, did not start until 2021. Correct. Correct, right after this lawsuit was filed, which makes it very similar to the Chavez versus New Mexico case in which this court said that retaliatory acts have to be considered on hostile work environment claim, even though those retaliatory acts in the Chavez case were not actionable by themselves. And in that case, those retaliatory acts... Were those exhausted? In this case? Yes. No. They don't have to be. My contention is that she exhausted it by filing her first EEOC complaint in September of 2020. She then got a right to sue letter and filed this lawsuit. And then the filing of this lawsuit was what prompted those other actions. And this court in the Ford versus Jackson Life insurance case said that as long as there is... A hostile work environment is a single act or single violation law with many component parts. As long as one of those component parts is exhausted, the other ones both pre and post 300 days do not have to be because as long as they form one part of the same hostile work environment, the same component. The retaliation claim is separate from the hostile work environment claim, isn't it? No. It is part and parcel of that. That's what this court has said in the Chavez versus New Mexico case. Again, I'm relying upon that because in that case, the retaliatory acts were because she filed the lawsuit. That's what happened in this case. There are a variety of retaliatory acts, but I contend that the strongest retaliatory acts are after she files this lawsuit. Mr. Jones gets served personally summons, and then nine days after that, he orders an internal investigation of mishandling. Wasn't that based upon a complaint made by another female employee against her? That was originally started out that way, and then it was determined that that female complaint was not substantiated, but they found that she was insubordinate based upon her own statements. What point was that developed in that determination made about it not being substantiated? The timeline is important because there was an investigation going on for approximately a month that she was not told about. Colonel Jones approved the investigation without notifying her, which the Lieutenant Colonel DeVore testified was unusual, and his experience had not ever been done in the last three years. Then after a month, they suspended her, not they, Colonel Jones, put her on administrative leave, cut her off with all contact with the highway patrol, and then continued to investigate that. Then Ms. Harrington gets notice that the original complaint about her was unsubstantiated, but that this insubordination claim was substantiated. Now, she denied that in her deposition, but furthermore, even after she had been notified that there has been substantiation of the claim, she remains on administrative leave, which obviously interfered with her ability to perform her duties for another six weeks. Then she gets returned, and all of those actions are by Colonel Jones. He's the head of the agency. He's the only one who can order an internal investigation. He's the only one who can order somebody to come back to work. He's the only one who can decide to fire someone. There's a record of support that Ms. Harrington, or Trooper Harrington, Captain Harrington, I think, was aware of other hostile work environment claims made by other women employees at Kansas Highway Patrol, similar to Fan and Steele. Yes. In fact, she testified, Ms. Fan and Steele told her about that. She also testified that all five of the women were interviewed on the same day by a television reporter, and my contention is a logical, reasonable inference from that is that they knew what each other's claims were. You know, the record is so vague on those television interviews. We don't know who said what or what one person knew about the other person's complaints. I mean, it's not even clear to me that they were all present when one of them was being interviewed, or if they ever saw the tape. I mean, that doesn't really help us much here. I agree with that, but Ms. Harrington, it's important to bear in mind, still works for the Highway Patrol, so there's no end to her hostile work environment claim, and she certainly knew about the allegations of all the other plaintiffs when this lawsuit was filed in January of 2020. I see, unless the court has any other questions, I'd like to reserve what little time I have for rebuttal. Thank you. Thank you. May it please the court, my name is Gay Tibbetts, and I represent the state of Kansas, primarily the Kansas Highway Patrol's actions in this case, and also Herman Jones' individually. There are two issues that are on appeal. The first is the Title VII hostile work environment that he's discussed, and I suppose that I'll probably spend most of my time discussing. The second is a First Amendment prior restraint claim. I just want to be sure that the court understands it's a prior restraint claim, because that has a completely different analysis than a typical First Amendment claim. I want to note that this started with six plaintiffs, like five or six, no, five to ten defendants, and we've kind of whittled it all down, and now what we have are just these three. Two of them are former employees, one is a current employee, and they have sort of gathered together everything that they've been complaining about and said, now the only thing we really still want to advance is a sexual harassment hostile work environment claim. And so the two things that you have asked about, well, first off, one thing that is different about each of these women is they worked in different places. I mean, we can't have an assumption that they were observing anything. The record will show that Ms. Harrington worked in what they call the docking building, because she was in charge, Captain Harrington was in charge of the guards at our capital, and Ms. Mader was more like an administrative assistant at the headquarters, and then Ms. Cooper worked about two hours away, or no, an hour away, because that's kind of part of what they argued about is how long it would take her to drive back and forth between Topeka and Manhattan. One thing they do have in common is none of them ever heard a sexist comment, a bad joke, you know, was showing any pictures. None of them were hit on. There was no evidence here of any kind of statements that women don't belong in the workplace, none of that kind of thing. Well, but that's not what they're, I mean, their claim isn't that kind of harassment. It's unwanted touching, right? Yes. And not treating them as favorably as the men. And the reason that I think, though, that it's important to point that out is in these cases where they've taken what they call gender-neutral conduct and combined it with gender-motivated conduct, one of the things you'll notice in all of those cases is that there are statements or actions that make you say, ah, the gender-neutral conduct must have been motivated by that other conduct, because they say things like, you know, women are incompetent or they make sexual comments. They say those kinds of things. So I think it is important that we don't have any of these actors making those kinds of statements. Well, I mean, if I make no comments but I never promote a woman and only promote men, I think you can still see what's going on. I mean, I don't think we require those comments. I don't think it required, but you'll note that in the cases he relies on, those are present. So I do think that that's a distinction to take some note of. Which was it? Harrington, on one of the two touches, said that she felt icky or it was inappropriate? The very first time they met, her testimony there is the very first time they met, he tapped her on the back of the shoulder and she said, don't do that, that's inappropriate. And he said, oh, I take it back. And he didn't just say, I take it back. He touched her again when he took it back. Yes, he did. He's a clown. I just mean he doesn't come across as a clown. He comes across as a problem. But the question is whether it raises to the level of a hostile work environment. That happened in August. He touched her again in October. She says that as he was reaching for her hand, as he shook the hands of all the men in the room, that he put his hand down her arm and stood close to her. That was in October, so a couple of months later. December is the one that you've already referred to, Judge Murphy, where she didn't even realize until somebody said later, oh, I think he was touching your shoulders, and that was inappropriate. And then you have from December until eight months later when her supervisor is replaced by Andrew Dean, where you don't have anything by anybody that she is complaining about. She begins to complain because, or she complains in her briefing, that Andrew Dean gave her assignments that she thought were setting her up wrong. And then after that, there is the report by the subordinate that she is creating a hostile work environment in their crew. And there's no evidence in this record anywhere that any of these supervisors had anything to do with that report. When they begin to investigate that report, they have not had, the record's clear, they've not had that kind of report with somebody who's this high-ranking before. I mean, it goes Colonel, Major, and the Captain. So she's a very high-ranking person in this sort of military title kind of job. And so they don't tell her because she has control over a lot of things. And it is not, unlike what he said, it's not Colonel Jones who makes that decision. The people in what we call in Kansas PSU, but you might think of them from TV instead of internal affairs, they said, she's high-ranking, will you give us permission to not tell her while we start the investigation? And he said yes. During that investigation, as you asked Judge Federico, they did uncover that several of the people who worked for her said she was saying insubordinate things. She was called the Colonel a dirty old man. She said that he didn't care about him. There was a whole list of things. They found the original complaint to be unsubstantiated, but that she was insubordinate and had been fostering unrest against the Colonel with her group. And so after they make that finding, her supervisor, Andy Dean, there is nothing, he never touched her, he never said anything negative, he didn't do anything. Andy Dean gives her an unsatisfactory evaluation. He says, you've been insubordinate to me, I've told you to do things, you didn't do them, and PSU found you were insubordinate. So now you have had an unsatisfactory evaluation and I'm going to put you on a 150-day performance plan. Counsel, can I ask you, you're talking about this one chain of events that plaintiffs argue is retaliatory and you're saying, well, no, here's how we explain it. And we've been discussing different incidents where, you know, it's a hugging and maybe it happened one way or maybe the other. As I hear us sort of dissecting all of these distinct either events or chain of events, I begin to struggle and think, well, aren't these quintessentially questions of fact? Like, why shouldn't the jury be deciding and see these people on a witness stand and hear them explain what happened to them? Why isn't that the right answer? Because could somebody have made that claim? Maybe. But in this record, you do not have them combined in some kind of hostile work environment. We're just talking about Harrington, which is what I've just been talking about. There's not anything there that would connect what Andrew Dean did with her with being touched, let's call it two times, frankly, a year before. But again, but maybe I think what happened to Captain Harrington, as I just hear it described, I think, well, maybe, you know, she's the classic eggshell plaintiff perhaps. But she's also a high-ranking official in the Kansas Highway Patrol, who, as you noted, was entrusted to guard the state capitol. So, you know, she's a person of some achievement and esteem. And wouldn't the jury, you know, wouldn't they be better positioned to have her come in and explain these are the events, this was the context of the events, and again, isn't that what our case law says, why these are questions of fact that a jury should decide? But in order to keep every woman who's employed and who is unhappy with their supervision or unhappy with her review, there are some requirements. One is it has to be somehow connected to her sex. And all she has to connect this to her sex is those two touchings a year before by somebody else. And then all of the things that Andrew did, there's no link between what Major Dean did and her sex. And so, you know, and we have the severe and pervasive. And you say, well, maybe she's an eggshell plaintiff. Well, she doesn't, it has to be subjective and objective. Subjective, okay, great, she's an eggshell plaintiff, it's too bad. Objective, other people would have to say that's hostile work environment, two touches on the shoulder. So, and he just said that she knew about them, you search this record. You will not find that Amber Harrington knew about all of these things. It's not in the record. I hate to be the kind of lawyer that points out that a record is poor. But, you know, the court below said, well, you said a bunch of stuff here, but none of it was attached and it's not connected. And then even in this appeal, the same thing happened. He cited the pages and it's not there. And in his reply brief, he says, well, but you acknowledged in the brief below that there had been some reports. And I'm like, you can't do that in your reply brief. You have to tell me what we're relying on before we get to the reply. And so, I want to talk specifically, though, about the other evidence. So, you've got Ms. Harrington. Unless she brings you evidence that either the things that Andy Dean did were somehow connected to her gender, or that these things that happened with other women were a part of her work environment, you can't just lump it all together and say, well, it sounds like it was pretty bad around there. So, I want to go from Ms. Harrington to Ms. Fannin-Steele. Ms. Fannin-Steele was the HR director. She has the instant messages. I don't know if you need me to read them to you, but they are not sexual by any means. And he said something about how the court found they might have been gender related. I think she used the phrase might. It was sort of like, well, okay, even if you thought these were gender related, she didn't make a finding that they were gender related. But Fannin-Steele has that. That's in October of 2019. In December of 2019, she has Major Murphy, a different guy, who comes into her as the HR director, closes her door, and says, let me tell you what an employee did. And he gets right close to her. She says, you're in my space. And he's trying to show her something. So that's her second thing that she claims is based on sex. And then she has a discussion about a letter written to Colonel Jones. And her description of it, which we have to take at this point, is that, you know, they were angry about it, and Colonel Jones said, if I find out who writes this letter. But it was a letter that was critical of both her and of Colonel Jones. And Lieutenant Colonel DeVore was in that meeting. She has no evidence in this record at all that he had anything to do with treating people unfairly because of their gender. He was a part of that discussion. And then the final thing is she says that DeVore and Jones would not listen to her HR recommendations during meetings between about February of 2020 and when she left in September of 2020. And again, no connection there. You know, she doesn't say, they listened to the man in the room. She doesn't say, here's a recommendation I made that a man had made. There's no connection to her gender. And the way that they try to get around that is they say, well, she has these gender things, these instant messages and this visit with the major. It was brief, and he wasn't involved in anything else. And that's enough for us to bring in these gender neutral things and ask the jury to decide, is this all a hostile work environment for her? And it's just not. The record is not there. Could somebody have made a record by doing that? Perhaps. But it's not in this record. And then finally, I want to talk just a minute about Ms. Mader and Ms. McCurdy. Ms. Mader worked in that same building. She had, let me see, I said she had five instances over the time, but one of them is he shakes her shoulders and says, why are you shaking it for me? One, he says, oh, feel how cold my hands are. One, he's breathing on her neck and asking her, is this making you feel uncomfortable? And then singing. And then he shook her hand when she came back from COVID, and when he reached for her hand, his hand touched her leg, which was because her hand was on her lap. And then he asked her about sitting crisscross applesauce in her chair and said, a lot of girls don't sit like that when they're in the office. That's it. That's what, six months, six incidences, and not a single plaintiff in this who's left here observed any of that. And there's really not even good evidence that any of them ever knew about those things while Ms. Mader was there. There is this, by the time that they got to the television station, I don't know if they were interviewed together. I don't know who shared what. There's just not an evidentiary record from which you could conclude. Could that record maybe have been made? I don't know. But there's nobody who says, in October this happened, in November this happened. I found this particular thing out in May. Mrs. McCurdy, or Ms. McCurdy, Trooper McCurdy, actually, is a completely different story because she was in, she was in Salina, I think. I can't remember where she's stationed, but she's in a different city. And she has three interactions where he hugged her. Nobody was present during any of those. She never told him to stop. And then he says to her during a meeting, hey, woman, woman, woman, did you bring your own lunch? Good for you. Those are her things. Before we run out of time, can I ask you about the Cooper claims? Absolutely. Yes, yes, yes. About the prior restraint argument, is there evidence in the record that Trooper Cooper communicated to someone, she had this letter, she intended to send it? Never, never. Okay. Never, never, never. And her whole claim is based on her saying that Colonel Jones had encouraged people to get in the canoe, which is basically, you know, he's trying to run the thing and he says everybody needs to be paddling in the same canoe. And that he put that in the newsletter. It wasn't there. And then they pointed to him saying we should protect the reputation of the Highway Patrol. Thank you. Thank you. Since I didn't address Ms. Cooper's claim in my first part, I'd like to very briefly describe what that was. Ms. Cooper testified that she prepared a letter that she intended to send to the governor. The letter was part of the record and she testified that she did not send it because she felt that Mr. Jones, Colonel Jones, had threatened their jobs. And the best evidence of the threat comes from Colonel Jones himself in which he admitted, yes, when he would have in-training sessions, he would tell the people that we've all got to be in the same canoe and row the same way and people who are not in my canoe will be dealt with. And he further admitted that two people who were not in his canoe had been terminated. She reasonably assumed from that if she was not in his canoe, if she criticized him to the governor, she would be fired. And that's the chilling of her speech. Even assuming that Ms. Cooper has standing on a First Amendment claim, she didn't raise any argument in response to the qualified immunity defense in the district court. So hasn't she waived that? No, she did. She cited the Wolf v. City of Wichita, which talks about what is a matter of public concern. And in a First Amendment claim, that's really the essence of that claim. The fact that you cited Wolf but you didn't make any argument about the two prongs of qualified immunity isn't preserving it. Well, we argued that it met the public concern issue, which was at the heart of that claim. I see I'm out of time. All right. Thank you. Thank you. We will take this matter under advisement.